**UNITED STATES of America**

v.

**Stephen SACCOCCIA, Donna Saccoccia, Anthony DeMarco, Vincent Hurley, James Saccoccio, Kenneth Saccoccio, Stanley Cerilla, Stephen Pizzo, Carlo DeMarco.**

Crim. A. No. 91–115–T.

United States District Court,
D. Rhode Island.

June 4, 1993.

James Leavey, Michael Davitt, Asst. U.S. Attys., U.S. Dept. of Justice, Providence, RI, for U.S.

Kenneth O'Donnell, Providence, RI, Jack Hill, San Francisco, CA, for Stephen Saccoccia.

Lawrence Semenza, Reno, NV, for Donna Saccoccia.

Robert D. Watt, Jr., Providence, RI, for Anthony DeMarco.

Frederick Cass, Providence, RI, for Vincent Hurley.

Mary June Ciresi, North Providence, RI, for James Saccoccio.

Edward C. Roy, Jr., East Greenwich, RI, for Kenneth Saccoccio.

James McCormick, Providence, RI, for Stanley Cerilla.

Joel Hirschorn, Coral Gables, FL, Richard Corley, Providence, RI, for Stephen Pizzo.

Vincent Indeglia, Providence, RI, for Carlo DeMarco.

## OPINION

TORRES, District Judge.

Stephen Saccoccia, Donna Saccoccia, Anthony DeMarco, Vincent Hurley, James Saccoccio, Kenneth Saccoccio, Stanley Cerilla, Stephen Pizzo, and Carlo DeMarco have been convicted of a variety of offenses stemming from what the indictment describes as a conspiracy to launder more than $136 million derived from the illegal sale of narcotics. All of the defendants were found guilty of RICO conspiracy violations under 18 U.S.C. § 1962(d). In addition, most of the defendants were found guilty of one or more related substantive offenses, namely, filing false currency transaction reports (CTR's) in violation of 31 U.S.C. § 5324(2); structuring cash transactions with financial institutions in violation of 31 U.S.C. § 5324(3); engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957; money laundering in violation of 18 U.S.C. § 1956; and/or Travel Act violations under 18 U.S.C. § 1952.

In entering judgment under Federal Rule of Criminal Procedure 32(b), the Court is now called upon to determine what "property" each defendant should be required to forfeit pursuant to 18 U.S.C. §§ 1963(a) and/or 982.[1] In making that determination, the Court must construe those statutes and make findings regarding the respective roles of the defendants in the offenses of conviction.

## BURDEN OF PROOF

Before reciting its findings of fact, the Court feels compelled to make mention of the uncertainty regarding the standard of proof applicable to criminal forfeiture determinations. *See United States v. Ofchinick,* 883 F.2d 1172, 1177 n. 1 (3rd Cir.1989), *cert. denied sub nom., DeLucia v. United States,* 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769

(1990). On the one hand, there is no question that criminal forfeiture is imposed as a sanction against a defendant. S.Rep. No. 225, 98th Cong., 2d Sess., 191, 193 (1984), *reprinted in,* 1984 U.S.Code Cong. & Admin.News 3182, 3376. *See also United States v. Cauble,* 706 F.2d 1322, 1349 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984) ("The RICO forfeiture is *in personam:* a punishment imposed on a guilty defendant."). "[I]t goes only to the penalty imposed rather than to the individual's criminal liability." *United States v. Caporale,* 806 F.2d 1487, 1508 (11th Cir.1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). Thus, criminal forfeiture is part of the sentencing process and not an element of the crime itself. *United States v. Horak,* 833 F.2d 1235, 1246 (7th Cir.1987). Accordingly, it has been held that due process does not require application of the beyond a reasonable doubt standard. *United States v. Elgersma,* 971 F.2d 690, 694 (11th Cir.1992).

On the other hand, neither § 1963(a) nor § 982 provide any explicit guidance as to what standard of proof Congress intended to apply under those statutes. Moreover, those cases touching on the issue generally do so without explanation. *See, e.g., United States v. Cauble,* 706 F.2d 1322 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. Horak,* 833 F.2d 1235 (7th Cir.1987).

One notable exception is *United States v. Pryba,* 674 F.Supp. 1518 (E.D.Va.1987). There, the court held that, under RICO, proof beyond a reasonable doubt was required. The court noted that Congress had provided for a preponderance of the evidence standard in other statutes and concluded that "[b]y choosing not to use the same language in § 1963(a) Congress has invited the inference that the reasonable doubt standard should be employed throughout a RICO proceeding except where there is explicit provision otherwise." *Id.* at 1521. Furthermore, the *Pryba* court pointed out that:

> $52,800.00 pursuant to 18 U.S.C. § 982. The remaining defendants have waived any right to a jury trial with respect to the forfeiture issues.

---

1. The amount to be forfeited by Vincent Hurley was submitted to the jury which returned a special verdict providing for forfeiture of $136,344,-231.86 pursuant to 18 U.S.C. § 1963(a)(3) and

There is no requirement in RICO that the guilt or innocence phase of the trial be bifurcated from the forfeiture phase. Often the phases are tried together.... Surely there can be no question that the reasonable doubt standard applies to the first phase. Almost as free from doubt is the inference that had Congress intended a different standard to apply, it would have recognized and addressed the practical difficulties involved in applying different proof standards to interrelated issues in the same proceeding.

*Id.* at 1521 (citations omitted).

In this case, the Court need not address the burden of proof issue because the government does not dispute that the beyond a reasonable doubt standard should be applied. Hopefully, Congress or the Supreme Court will provide definitive guidance on the subject before it becomes a pivotal issue in too many cases.

### FACTS

Between 1986 and his arrest in November, 1991, Stephen Saccoccia was the *de facto* owner and manager of several corporations ostensibly engaged in the business of buying, selling, and refining gold and other precious metals in Rhode Island, New York and California. The remaining defendants were employed at various times and in various capacities by Saccoccia and/or his corporations, and they acted pursuant to Saccoccia's instructions. In fact, much of the "business" in which the defendants were engaged consisted of "laundering" the proceeds of illegal narcotics sales for a Colombian drug cartel and its agents including Duvan Arboleda, Fernando Duenas, and Raoul Escobar.

Stephen Saccoccia's money laundering activities began in 1987 when he caused cash received from Arboleda to be delivered to Barry Slomovitz, another money launderer in New York. Slomovitz used the cash to covertly purchase gold that he resold on the open market. The amounts realized from those sales were wired to bank accounts maintained by two of Saccoccia's corporations, Trend Precious Metals ("Trend") in Cranston, Rhode Island, and International Metal Marketing ("IMM") in Los Angeles,

California. In order to create the appearance that the funds transferred were derived from legitimate business transactions, Stephen and Donna Saccoccia caused phony invoices to be issued to Slomovitz falsely indicating that the amounts wired to Trend and IMM were payments for gold purchases.

By 1990, Saccoccia's money laundering enterprise had expanded, and he began operating independently from Slomovitz. Cash received from Arboleda, Duenas, or Escobar was delivered to the defendants in New York City in a variety of ways. Sometimes Vincent Hurley or Anthony DeMarco met couriers at pre-arranged locations. On other occasions, couriers delivered the cash to one of Trend's New York offices. In one instance during August, 1991, $3 million was delivered to Stephen and Donna Saccoccia's apartment in Manhattan.

The cash was delivered in amounts that generally ranged from $50,000.00 to $500,-000.00 and consisted of large numbers of small denomination bills carried in gym bags or luggage. The cash usually was counted by Stephen Saccoccia, Donna Saccoccia, and/or Richard Gizzarelli, an unindicted co-conspirator. Occasionally, they were assisted by Anthony DeMarco, Vincent Hurley, and David Izzi, an indicted co-conspirator.

After the cash was counted, some of it was sent to Trend or Saccoccia Coin Company ("Saccoccia Coin"), another one of Saccoccia's Rhode Island companies. The remainder was sent to IMM in Los Angeles. Initially, the cash sent to Rhode Island was shipped via Loomis or Brinks armored cars. However, when Saccoccia became concerned that law enforcement authorities might be monitoring those shipments, he arranged to have the cash transported to Cranston, Rhode Island by Richard Gizzarelli, Anthony DeMarco, Carlo DeMarco, Vincent Hurley, and David Izzi. Usually, Gizzarelli and one of the defendants drove from New York to a rendezvous point in Connecticut where they transferred the cash to Izzi and two of the other defendants who brought it back to Rhode Island.

When the cash arrived at Trend or Saccoccia Coin, it was counted again by Vincent

Hurley, David Izzi, Carlo DeMarco, Anthony DeMarco, Kenneth Saccoccio, James Saccoccio, Stanley Cerilla and/or Stephen Pizzo and divided into packets that usually contained less than $10,000.00 each. The packets, then, were taken to a number of different banks and used to purchase cashier's checks payable to Trend. In that way, the defendants circumvented the currency transaction reporting requirements of 31 U.S.C. § 5313 which required financial institutions to file reports containing the identities of persons engaging in cash transactions involving more than $10,000.00.[2] When cashier's checks for more than $10,000.00 were purchased, they generally were made payable to corporations nominally controlled by Anthony DeMarco even though the defendants knew that the cash actually belonged to Saccoccia. The amount of the checks purchased in this fashion by each defendant was as follows:

| Name | Time Period | Amount |
|------|-------------|--------|
| James Saccoccio | March 23, 1990 to October 29, 1990 | $ 2,993,445.00 |
| Kenneth Saccoccio | March 1, 1990 to May 28, 1991 | $11,258,955.00 |
| Anthony DeMarco | March 6, 1990 to August 7, 1991 | $11,250,985.79 |
| David Izzi | April 6, 1990 to August 22, 1991 | $11,952,715.00 |
| Total | | $37,456,100.79 |

The checks payable to Trend were deposited in Trend's account at Citizens Bank which was controlled by Stephen and Donna Saccoccia. The checks payable to other entities were deposited into accounts in the names of those entities and then transferred into Trend's account at Citizens. The cash sent to IMM was used to covertly purchase gold that was later sold at a loss on the open market. The amounts realized were deposited in Los Angeles banks and wired to Trend's account at Citizens.

Between January 1, 1990 and April 2, 1991, Stephen and Donna Saccoccia wired $136,344,231.86 from Trend's account at Citizens to various Colombian and other foreign bank accounts, designated by Arboleda or Duenas, thereby completing the money laundering cycle.

## THE FORFEITURE ALLEGATIONS

As already noted, all of the defendants were convicted of RICO conspiracy in violation of 18 U.S.C. § 1962(d). In addition, all of the defendants except Carlo DeMarco and Stephen Pizzo were convicted of substantive violations as follows:

**2.** The form on which the financial institution must make its report is I.R.S. Form 4789 which is called a currency transaction report and which must be filed by the bank with the I.R.S. within 15 days after the transaction occurs. The information to be reported on a CTR includes the identity of the individual who conducted the currency transaction with the bank, the individual or organization for whom the transaction was conducted, and a description of the transaction. 31 U.S.C. § 5313, 31 C.F.R. § 103.22(a)(1).

It is a violation of 31 U.S.C. § 5324(2) to cause a domestic financial institution to file false CTR's for the purpose of evading the reporting requirements established by 31 U.S.C. § 5313. It is a violation of 31 U.S.C. § 5324(3) to structure or attempt to structure transactions with domestic financial institutions for the purpose of evading the reporting requirements established by 31 U.S.C. § 5313. Structuring includes the breaking down of an amount of currency exceeding $10,000.00 into sums of less than $10,000.00 to prevent CTR's from being filed. Structuring also includes breaking an amount of currency exceeding $10,000.00 into smaller amounts greater than $10,000.00 to prevent them from being reported as a single transaction.

| Defendant | Offense | No. of Counts of Conviction | Amount |
|-----------|---------|-----------------------------|--------|
| S. Saccoccia [3] | 18:1957 | 36 | $4,743,457.00 |
|  | 18:1956 | 13 | $4,639,300.75 |
| D. Saccoccia | 18:1957 | 47 | $5,623,157.00 |
|  | 18:1956 | 13 | $4,639,300.75 |
| A. DeMarco | 31:5324(2) | 5 | $ 292,000.00 |
|  | 31:5324(3) | 2 | $ 73,000.00 |
| V. Hurley [4] | 31:5324(3) | 1 | $ 52,800.00 |
| J. Saccoccio | 31:5324(3) | 15 | $ 707,750.00 |
| K. Saccoccio | 31:5324(3) | 14 | $ 665,750.00 |
| S. Cerilla | 31:5324(3) | 1 | $ 52,800.00 |

Pursuant to 18 U.S.C. § 1963(a)(1) and (2), the government seeks forfeiture of the Saccoccias' interest in all assets, including bank accounts, of Trend, Saccoccia Coin and IMM as well as International Chain Sales, Vogue Precious Metals, Refined Metals, Gold Enterprises Refinery, and SASCO Refining Company, which were other companies used in the defendants' money laundering activities. In addition, the government alleges that, under 18 U.S.C. § 1963(a)(3), each defendant should forfeit the amount of $136,344,231.86 which the government contends is the amount "constituting or derived from [the] proceeds" obtained by the defendants from racketeering activity. Finally, the government asserts that, under the Criminal Forfeiture statute, 18 U.S.C. § 982(a), each defendant should be required to forfeit the amounts involved in the transactions that were the subjects of the substantive offenses for which that defendant was convicted.

Those claims raise several issues of first impression regarding the manner in which the forfeiture provisions contained in both RICO and the Criminal Forfeiture statute should be construed. In analyzing those provisions, a page of history is worth a volume of logic.

## DISCUSSION

### I. *Historical Background*

■ The origins of both criminal and civil forfeiture may be traced to English common law. Criminal forfeiture was a penalty constituting one of the incidents of the state of attainder in which individuals convicted of felonies were placed.[5] *See generally Avery v. Everett,* 110 N.Y. 317, 18 N.E. 148 (1888). It operated *in personam* against the defendant and required that all of the goods, chattels, lands, and tenements of the attainted felon be forfeited to the king as part of the felon's punishment for committing the crime. The defendant's property was forfeited whether or not it was linked to the crime.

■ Civil forfeiture, on the other hand, resulted from an *in rem* proceeding against property itself. It was based on the notion that property associated with criminal activi-

---

**3.** Stephen Saccoccia and Vincent Hurley were also convicted of Travel Act violations under 18 U.S.C. § 1952. However, that is not an offense for which the penalty of forfeiture may be imposed.

**4.** *See supra* note 3.

**5.** The other incidents of the state of attainder were corruption of blood which prevented descent of the felon's estate to his heirs causing it to escheat and civil death which disqualified the attainted felon from bringing legal action, from being a witness, and from performing any legal function.

ty was tainted and, therefore, became forfeitable even if not owned by the person perpetrating the crime.

Abuses of the bill of attainder by the English monarchy led the Framers of our Constitution to limit the application of criminal forfeiture. Thus Article III, Section 3 prohibits forfeiture as a penalty for treason except during the life of the person attainted. In 1790, the First Congress extended that prohibition by eliminating forfeiture of one's estate and corruption of blood as penalties for all felonies. Act of April 30, 1790, Ch. 9, § 24, 1 Statutes at Large 117. *See United States v. Huber,* 603 F.2d 387 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

In 1970, Congress revived the penalty of criminal forfeiture when it enacted the RICO statute. 18 U.S.C. § 1963. At the same time, it provided for civil forfeiture of property used in connection with or received as the proceeds of narcotics offenses. *See, e.g.,* 21 U.S.C. § 881. In 1986, forfeiture provisions similar to those of RICO were made applicable to money laundering and CTR violations. 18 U.S.C. § 982.

■ Under those statutes, the historical distinctions between criminal and civil forfeiture have become somewhat blurred. Criminal forfeiture continues to be an *in personam* penalty. However, unlike its common law ancestor, it now requires a nexus between the crime and the property forfeited. Moreover, the description of that nexus varies from statute to statute for reasons that are not readily apparent.

## II. *The RICO Forfeiture Statute—18 U.S.C. § 1963*

RICO requires that any person who violates its provisions shall forfeit:

(1) any interest the person has acquired or maintained in violation of [RICO];

(2) any—

  (A) interest in; [or]

  . . . .

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of [RICO]; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity. . . .

18 U.S.C. § 1963(a).

Subsection 1963(m) contains a "substitution of assets" provision which states that:

(m) If any of the property described in subsection (a), as a result of any act or omission of the defendant—

  (1) cannot be located upon the exercise of due diligence;

  (2) has been transferred or sold to, or deposited with, a third party;

  (3) has been placed beyond the jurisdiction of the court;

  (4) has been substantially diminished in value; or

  (5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

18 U.S.C. § 1963(m).

### A. *"Interest" and "Proceeds"*

■ In this case, it is clear that Stephen Saccoccia controlled and Donna Saccoccia participated in the criminal enterprise described in the indictment. It is equally clear that the enterprise included Trend, Saccoccia Coin, IMM, International Chain Sales, Vogue Precious Metals, Refined Metals, Gold Enterprise Refinery, and SASCO Refining Company. Therefore, any interest the Saccoccias have in those entities is forfeitable under 18 U.S.C. § 1963(a)(2).[6]

What is not so clear is the nature of the property forfeitable under §§ 1963(a)(1), (3),

---

**6.** Neither the RICO forfeiture allegations nor the money laundering forfeiture allegations aver that any of the other defendants have any forfeitable interest in those entities.

and/or (m). Those subsections describe four kinds of property subject to forfeiture:

1. any "interest" acquired in violation of RICO;

2. "proceeds" of the racketeering activity;

3. property "derived from" such proceeds; and

4. "substitute assets" equivalent in value to any such "proceeds" or property that have been concealed, transferred, or otherwise disposed of by the defendant.

The Supreme Court has held that the term "interest," as used in § 1963(a)(1), is not limited to a defendant's interest in the enterprise but, rather, encompasses *any* interest acquired in violation of RICO. *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Moreover, it has stated that "interest" should be construed broadly and "comprehends all forms of real and personal property, including profits and proceeds." *Id.* at 21, 104 S.Ct. at 299.

In *Russello,* it was determined that money paid to the appellant by an insurance company pursuant to fraudulent fire insurance claims was forfeitable under § 1963(a)(1) as an interest acquired in violation of RICO. The Supreme Court upheld forfeiture of the gross amount received even though the appellant paid a portion of that amount to a co-conspirator for his assistance. However, the Court expressly refrained from "resolv[ing] any ambiguity that might be inherent in the terms 'profits' and 'proceeds.'" *Id.* at 29, n. 3, 104 S.Ct. at 304, n. 3. This Court must now resolve that ambiguity.

■ The meaning to be ascribed to "proceeds" is significant because that is the operative term in subsection (a)(3). Under § 1963(a)(3), it is only "proceeds" or property derived from "proceeds" that are subject to forfeiture.

In this case, the government contends that "proceeds" means the entire amount laundered by the conspiracy. The defendants, on the other hand, assert that only the "net profits" received by each defendant is forfei-

table. This Court finds that RICO requires something between those two extremes.

Implicit in the positions taken by the parties is their recognition that "proceeds" and "profits" are two different things. *Russello* indicates that the Supreme Court also recognized that the two terms are not synonymous by invariably referring to them in conjunction with each other and never using them interchangeably. Moreover, the *Russello* court acknowledged that it had not resolved any ambiguity in the "terms 'profits' and 'proceeds.'" *Id.* (emphasis added). By referring to those terms in the plural, the Court again indicated that it viewed them as separate and distinct.

The language and legislative history of § 1963(a)(3) provide compelling evidence that Congress, too, recognized the distinction between "proceeds" and "profits" and that it intended forfeitable "proceeds" to encompass more than the net gain realized by a defendant. The amendment adding subsection (a)(3) to § 1963 was proposed before but not enacted until after *Russello* was decided. It was a response to several lower court decisions holding that "proceeds" and "profits" were not "interests" forfeitable under § 1963(a)(1).[7] Its purpose was to make it clear that "proceeds" and "profits" are forfeitable. S.Rep. No. 225, 98th Cong., 2d Sess., 199 (1984), *reprinted in,* 1984 U.S.Code Cong. & Admin.News 3182, 3382.

Because § 1963(a)(3) was designed to reach "proceeds" *and* "profits," the fact that the statute uses only the word "proceeds" strongly suggests that Congress intended "proceeds" to have a broader meaning that includes "profits." Such intent is clearly manifested in the following excerpt from the legislative history of § 1963(a)(3):

> In paragraph (3), the term "proceeds" has been used in lieu of the term "profits" in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were.

**7.** *See United States v. Marubeni American Corp.,* 611 F.2d 763 (9th Cir.1980); *United States v. Thevis,* 474 F.Supp. 134 (N.D.Ga.1979), *aff'd on* other grounds, 665 F.2d 616 (5th Cir.1982); *United States v. Meyers,* 432 F.Supp. 456 (W.D.Pa. 1977).

S.Rep. No. 225, 98th Cong., 2d Sess., 199 (1984), *reprinted in,* 1984 U.S.Code Cong. & Admin.News 3182, 3382 (footnote omitted).

The commonly understood definitions of the two terms buttress the conclusion that Congress intended "proceeds" to include the gross amount realized from racketeering activity. Webster lists the preferred definition of "proceeds" as "what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue: the total amount brought in." Webster's Third New International Dictionary 1807 (1986). "Profit," by contrast, is defined as "the excess of returns over expenditure in a transaction or series of transactions," Webster's Third New International Dictionary 1811 (1986), or "the gross *proceeds* of a business transaction less the costs of the transaction." Black's Law Dictionary 1211 (6th Ed. 1990) (emphasis added).

That conclusion is further reinforced by the purpose underlying criminal forfeiture provisions in general and RICO in particular. As already noted, the objective of criminal forfeiture is to punish the defendant for committing a crime. Criminal forfeiture provisions were not intended to "require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced." *United States v. Lizza Industries, Inc.,* 775 F.2d 492, 498 (2d Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986).

Nor can there be any doubt that Congress intended the forfeiture provisions to be interpreted broadly in order to achieve that purpose. The statute creating RICO expressly provides that "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." *Russello,* 464 U.S. at 27, 104 S.Ct. at 302 (citing § 904(a) of Pub.L. 91–452, 84 Stat. 947).

Furthermore, the practical difficulties inherent in requiring the government to prove the net gains received by a defendant rather than the gross amounts realized from the racketeering activity would frustrate Congress' intent. The precise amount of a defendant's share in the fruits of concerted illegal activity and/or the expenses incurred by the defendant are matters generally known only to the defendant and other participants. Therefore, imputing to Congress an intent that forfeiture extend only to those amounts that the government proves a defendant received as "profits" would be inconsistent with RICO's purpose and would eviscerate the statute. *See Caporale,* 806 F.2d at 1508; *United States v. Milicia,* 769 F.Supp. 877, 889–90 (E.D.Pa.1991) (construing 21 U.S.C. § 853); *Cf. Lizza Industries, Inc.,* 775 F.2d at 498.

Finally, it seems rather incongruous to suggest that the expenses incurred by a defendant in conducting a racketeering enterprise should be deducted in calculating the amount for which that defendant is criminally responsible. *Milicia,* 769 F.Supp. at 890. As already noted, criminal forfeiture is a penalty for committing a crime. The measure of criminal responsibility is the harm for which the defendant may be held accountable not the net gain realized by the defendant from the crime.

In short, this Court concludes that the term "proceeds" as used in § 1963(a)(3) means the entire amount realized from racketeering activity and not just the "profits" made by a defendant. In addition, such "proceeds" also are forfeitable under § 1963(a)(1) inasmuch as the Supreme Court has determined that the term "interest," as used in that section, comprehends both "proceeds" and "profits." *Russello,* 464 U.S. at 21, 104 S.Ct. at 299.

### B. *The Amount "Obtained" by a Defendant*

■ The fact that the "proceeds" of racketeering activity includes the entire amount realized from such activity does not necessarily mean that every member of a RICO conspiracy must forfeit all of the proceeds generated by the conspiracy. Under § 1963(a)(3), a defendant is required to forfeit only property "obtained" by that defendant from the racketeering activity. Therefore, the amount forfeitable by a particular defendant depends on two factors:

1. The amount of proceeds "obtained" by that defendant; and

2. The amount of proceeds "obtained" by co-conspirators for which the defendant is accountable under established principles governing sentencing responsibility for the acts of co-conspirators.

██ Section 1963(a)(3) provides that such property is forfeitable whether it is obtained "directly or indirectly." Consequently, a defendant may be viewed as having "obtained" proceeds even though that defendant never had physical possession of the proceeds. For example, a defendant who was entitled to a share of the proceeds may be considered to have "obtained" that share despite not having received actual delivery of his share. Similarly, a defendant having an undivided interest in a common pool of proceeds may be deemed to have "obtained" an interest in those proceeds. *See Russello*, 464 U.S. at 22, 104 S.Ct. at 300 ("Before profits of an illegal enterprise are divided, each participant may be said to own an 'interest' in the ill-gotten gains. After distribution, each will have a possessory interest in currency or other items so distributed.").

██ Generally, a defendant should not be considered to have "obtained" proceeds that merely passed through his hands or proceeds received by others in which the defendant had no direct interest. *See, e.g.,* 18 U.S.C. § 982(b)(2); *United States v. Regan*, 699 F.Supp. 36, 39 (S.D.N.Y.1988) (construing § 1963(a)(2)). However, it is well established that, for sentencing purposes, a defendant is accountable for the acts of co-conspirators that were committed in furtherance of the conspiracy and were reasonably foreseeable by the defendant. U.S.S.G. § 1B1.3(a)(1)(B); *United States v. O'Campo*, 973 F.2d 1015 (1st Cir.1992). Thus, the Guidelines expressly require that both base offense levels and adjustments for specific offense characteristics be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). In the case of racketeering activity that involves money laundering offenses, one of the specific offense characteristic adjustments is a function of the amount of money involved (U.S.S.G. § 2S1.1(b)(2)); and, therefore, is calculated in accordance with the principles set forth in § 1B1.3(a)(1)(B). That is to say, it includes the reasonably foreseeable amounts laundered by co-conspirators in furtherance of the conspiracy.

Since criminal forfeiture is a form of punishment, it follows that the same principles of sentencing accountability should apply. For purposes of § 1963(a)(3), a defendant should be deemed to have "obtained" amounts "obtained" by co-conspirators in furtherance of the conspiracy to the extent that receipt of those amounts was reasonably foreseeable. In fact, in applying the forfeiture provisions contained in other statutes, several courts have concluded that conspirators are jointly and severally liable for amounts illicitly received pursuant to the conspiracy. *See United States v. Caporale*, 806 F.2d 1487 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987) (§ 1963(a)(1)); *United States v. Wilson*, 742 F.Supp. 905 (E.D.Pa.1989), *aff'd*, 909 F.2d 1478 (3rd Cir.), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 589, 112 L.Ed.2d 593 (1990); *United States v. Benevento*, 663 F.Supp. 1115 (S.D.N.Y.1987), *aff'd*, 836 F.2d 129 (2d Cir. 1988) (21 U.S.C. § 853).

Once again, holding otherwise would defeat the overriding purpose of RICO forfeiture which is to deprive those engaging in racketeering activity of the fruits of their illegal conduct. In most cases, it would be a practical impossibility to determine the precise amount of each conspirator's share in the conspiracy's criminal proceeds.

For all of those reasons, this Court concludes that, for purposes of § 1963(a)(3), the proceeds "obtained" by a defendant include all proceeds obtained by that defendant, directly or indirectly, from racketeering activity. It also includes all proceeds obtained by co-conspirators in furtherance of the racketeering conspiracy to the extent reasonably foreseeable by the defendant.

C. *Property "Derived From" Proceeds and "Substitute Assets"*

Although the amount of "proceeds" "obtained" by a defendant from racketeering activity may be known, the "proceeds" can-

not be forfeited if the defendant does not have them. For that reason, § 1963(a)(3) also provides for forfeiture of property "derived from" those proceeds. Moreover, § 1963(m) provides that, where the defendant has concealed, transferred, or dissipated forfeitable property, the defendant shall be required to forfeit other property of equal value.

In order to be considered "derived from" racketeering proceeds, money or property must be traceable to those proceeds in the sense that its acquisition must be attributable to the proceeds rather than to money obtained from untainted sources. However, that does not mean that the very same dollars received as proceeds must have been used to purchase the property subject to forfeiture. *See United States v. Ginsburg,* 773 F.2d 798, 801 (7th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986) (§ 1963(a)(1)); *United States v. Navarro–Ordas,* 770 F.2d 959, 969–70 (11th Cir. 1985), *cert. denied sub nom., Rodriguez v. United States,* 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986) (§ 1963(a)(1)). Proof that the proceeds of racketeering activity enabled a defendant to acquire the property is sufficient to warrant forfeiture under § 1963(a)(3). *See United States v. Horak,* 833 F.2d 1235, 1243 (7th Cir.1987).

There is no such tracing requirement with respect to "substitute assets" under § 1963(m). If a defendant has concealed or disposed of "proceeds" of the illegal activity or property "derived from" those proceeds, *any* property of the defendant having an equivalent value is subject to forfeiture whether or not it was acquired from racketeering activity. In this respect, the "substitute assets" provision is more in accord with historical notions of criminal forfeiture because no direct link is required between the crime and the property subject to forfeiture.

III. *The Criminal Forfeiture Statute—18 U.S.C. § 982*

In the case of individuals convicted of substantive CTR or money laundering offenses, § 982 requires forfeiture of "any property ... *involved* in such offense or any property *traceable* to such property." 18 U.S.C.

§ 982(a)(1) (emphasis added). It is not clear why § 982 uses terms different from those used to describe property subject to forfeiture under § 1963. By providing for forfeiture where the *property* is "involved" in the offense, § 982 is more reminiscent of *in rem* civil forfeiture. Indeed, § 982 expressly incorporates the *civil* forfeiture provisions of 21 U.S.C. § 881(d) relating to property connected to drug offenses except to the extent that they may be inconsistent with the criminal forfeiture provisions. 18 U.S.C. § 982(b)(1)(A), 21 U.S.C. § 853(j).

In any event, any departure from traditional notions of *in personam* criminal forfeiture suggested by the terminology used in § 982 has no impact on this case. Property is "involved" in CTR or money laundering offenses whether it was the subject of those offenses or whether it was the proceeds generated by them. Moreover, § 982 incorporates the "substitute assets" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853(p)) which, in most respects, is identical to the corresponding RICO provision. *Compare* 21 U.S.C. § 982(b)(1)(A) *with* 18 U.S.C. § 1963(m). It is true that, unlike RICO, § 982(b)(2) expressly states that the "substitute assets" provision

> shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense *unless* the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period.

Section 982(b)(2) (emphasis added).

However, in this case, the only defendants who arguably might be construed as intermediaries (i.e., Kenneth Saccoccio, James Saccoccio, and Stanley Cerilla) also were convicted under 31 U.S.C. § 5322(b) for having been involved in a pattern of illegal activity involving more than $100,000.00 during a twelve month period. Since that pattern consisted of more than three transactions,

the intermediary exception under § 982(b)(2) does not apply.[8]

## IV. *The Amount Forfeitable*

■ In this case, the "proceeds" from the defendants' racketeering activity were $136,-344,231.86. That was the amount laundered by the conspiracy consisting of the defendants who did the laundering and the Colombian drug traffickers who provided the money to be laundered and received the money after it had been laundered.[9]

■ However, as already noted, that does not necessarily mean that each defendant must forfeit that entire sum. The amount forfeitable by a defendant convicted of a RICO conspiracy depends on the proceeds obtained by that defendant and the proceeds foreseeably obtained by co-conspirators pursuant to the conspiracy.

■ In this case, there is little evidence regarding the amounts directly obtained by each defendant. There was evidence that Stephen Saccoccia received commissions ranging from 5%—15% of the sums laundered and that various other defendants received unspecified commissions and/or salaries. However, the precise amounts are unknown.

What is known is the amount of proceeds realized by all conspirators, in the aggregate, and the portions reasonably foreseeable by each conspirator. The evidence clearly demonstrated that every defendant, except Carlo DeMarco, was active in the conspiracy's money laundering operations between January 1, 1990 and April 2, 1991. During that period, $136,344,231.86 was laundered and returned to the Colombian drug traffickers as their share of the illicit profits. The evidence also establishes that the Saccoccias' activities spanned the entire spectrum of the conspiracy's operation from receiving of the cash in New York to wiring laundered proceeds back to Colombia. Vincent Hurley and Anthony DeMarco also participated directly in most facets of the overall scheme including collecting cash from couriers, transporting it to Rhode Island, counting it and dividing it into smaller lots so that it could be taken to banks to purchase cashier's checks, and in DeMarco's case, sending some of the money to IMM to be laundered in California. Therefore, it is clear that the Saccoccias, Vincent Hurley, and Anthony DeMarco reasonably could have foreseen the receipt of $136,344,231.86 in proceeds.

■ On the other hand, the roles of the Saccoccio brothers, Cerilla, and Pizzo and, therefore, their perceptions of the amounts being laundered, were more limited. Although they were participants in the same conspiracy, their function was confined to counting the cash that was transported to Rhode Island and arranging for the purchase of cashier's checks and the deposits into Trend's account at Citizens. There is no evidence that they were involved directly in the money laundering activities occurring outside of Rhode Island or that they knew or had any interest in the amounts laundered at other places. Certainly, a strong argument can be made that they reasonably could have foreseen that their co-conspirators were laundering more than just the cash transported to Rhode Island. However, under these circumstances, such generalized knowledge is not a sufficient basis for requiring them to forfeit those amounts. Accordingly, the Court finds that the amounts forfeitable by the Saccoccios, Cerilla, and Pizzo under RICO is the $37,456,100.79 laundered through Trend and Saccoccia Coin.

Since the Saccoccios and Cerilla were convicted of substantive offenses requiring forfeiture under § 982 they also must forfeit the

---

8. Kenneth Saccoccio was convicted of fourteen counts of structuring in violation of 31 U.S.C. § 5324(3). James Saccoccio was convicted of fifteen counts of structuring in violation of 31 U.S.C. § 5324(3). Stanley Cerilla was convicted of only one count of structuring in violation of 31 U.S.C. § 5324(3), but the evidence indicates that he was involved in numerous other transactions during the course of the conspiracy.

9. Actually, the proceeds were greater because this figure represents only the amounts laundered and does not include "commissions" ranging from 5%—15% received by Stephen Saccoccia. However, the sum of $136,344,231.86 is used because that is the amount set forth in the forfeiture allegations of the indictment.

amounts involved in those offenses. As already noted, those amounts are as follows:

| | |
|---|---|
| James Saccoccio | $707,750.00 |
| Kenneth Saccoccio | $665,750.00 |
| Stanley Cerilla | $ 52,800.00 |

Of course, those amounts have already been taken into account in calculating the amounts forfeitable under RICO. Therefore, they are included in and are not in addition to the $37,456,100.79 that they must forfeit under § 1963.

In the case of Carlo DeMarco, the evidence shows that his participation in the conspiracy extended from August, 1991 to November, 1991. Because of that, the government concedes that the amount that he reasonably could have foreseen is limited to the $3,000,-000.00 that he helped count at the Saccoccias' apartment in August, 1991, and the $927,-357.55 represented by money order receipts, check carbons, and deposit tickets found in his apartment at the time of his arrest. Thus, the total amount forfeitable by Carlo DeMarco under the RICO conspiracy statute, the only offense for which he was convicted, is $3,927,357.55.