UNITED STATES of America, Appellee,

v.

**Earl A. GARNER, Appellant.**

UNITED STATES of America, Appellee,

v.

**Everett C. McKETHAN, Appellant.**

**Nos. 77–1222 and 77–1224.**

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1977.

Decided Feb. 17, 1978.

Michael McGettigan, Alexandria, Va. (George F. West, Jr., Murphy, McGettigan, McNally & West, Alexandria, Va., on brief), Leonard S. Rubenstein, Alexandria, Va. (Philip J. Hirschkop, Philip Hirschkop & Associates, Inc., Alexandria, Va., on brief), for appellants.

James R. Hubbard, Asst. U. S. Atty., Alexandria, Va. (William B. Cummings, U. S. Atty., Alexandria, Va., Justin W. Williams, Asst. U. S. Atty., Washington, D. C., Leonie Milhomme Brinkema, Sp. Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WIDENER and HALL, Circuit Judges.

HAYNSWORTH, Chief Judge:

Convicted of drug related offenses arising out of the alleged importation of substantial quantities of heroin from West Germany and Holland, the defendants complain primarily of the admission in evidence of the grand jury testimony of an alleged coconspirator who declined to testify at the trial despite the best efforts of the trial judge and his own lawyer to get him to do so.

## I.

Warren Robinson, the grand jury witness, had been indicted for offenses committed by him in connection with the importation of the heroin. He had previously commenced serving a six year sentence imposed upon him for unrelated offenses, and he

was under indictment in New York for still other unrelated offenses. Faced with the possibility that very heavy penalties might be imposed upon him if convicted under this indictment, he entered into a plea agreement. The agreement was that he would enter a plea of guilty to a two-count information, would testify fully before a grand jury and in any ensuing criminal proceedings, in exchange for which the government would dismiss the indictment. There was no agreement respecting the disposition of the New York charges.

Robinson entered his guilty pleas to the two counts in the information, and was sentenced to two successive five year terms to commence upon completion of his earlier six year sentence. He then appeared as a seemingly willing witness before a grand jury.

He told the grand jury that Garner had approached him with information that McKethan, an airline employee, had a source for large quantities of heroin in West Germany. Garner sought to enlist Robinson's participation in the importation of heroin from western Europe and its distribution in the metropolitan Washington area.

There followed a number of trips to West Germany and to Holland, where another source of supply had been developed with the assistance of their first contact. Robinson did not get his passport in time to make Garner's first trip, but he and Garner traveled together on two later ones, and he was told by the defendants of still later trips that they took. On one of the trips Garner and Robinson were accompanied by two young women who, traveling separately on the return trip, brought the heroin into the United States concealed in their girdles.

Before Garner and McKethan were brought to trial, Robinson indicated reluctance to testify at trial. This occasioned inquiry of him in an *in camera* proceeding before the trial opened. He then stated that in the absence of his lawyer he would not testify. His lawyer was summoned and advised him to testify, but to no avail. After the trial opened, though the court had

granted him use immunity and threatened him with a contempt citation if he refused, he persisted in his refusal to testify. In another *in camera* proceeding, Robinson indicated that he might answer questions put by defense counsel. The district court then ruled that, though he was "unavailable" as a witness within the meaning of Rule 804(b)(5) of the F.R.Evid., he was "available" for cross-examination by defense counsel. In the presence of the jury, Robinson stated that he knew Garner and McKethan and that his grand jury testimony was inaccurate. He answered some questions about European travel with answers which seemed to say that he knew nothing of any drug trafficking by Garner or McKethan. At other times he declined to answer, and his seeming disclaimers of knowledge may have been understood by the jury to be the equivalent of a refusal to testify. The transcript gives one the general impression not that the grand jury testimony was false but that, whatever pressures were brought upon him, the defendant was unwilling to testify, and particularly unwilling to say anything which would incriminate either of these defendants.

There is no explanation of this unwillingness. Cooperating former co-conspirators have sometimes been the victims of threats by their former associates facing trials. That Robinson was the victim of threats by either Garner or McKethan, however, can be no more than speculation. Robinson was in prison at the time, and he may have been the victim of the code that condemns a conspirator for testifying against his former associates.

## II.

In *United States v. West,* 4th Cir., 574 F.2d 1131, we have upheld the admission of sworn grand jury testimony, though not subject to cross-examination, when the witness was murdered in the interim between his grand jury testimony and the trial of the drug offenders. In that case, there was extraordinary corroboration of the grand jury testimony, for he had been wired for sound; his conversations had been recorded;

he had been kept under close surveillance when not within buildings, and the officers who had watched and recorded his conversations were witnesses available for cross-examination.

In *United States v. Carlson,* 8th Cir., 547 F.2d 1346, a grand jury witness refused to testify at Carlson's trial because, he said, of threats directed to him by Carlson. That, too, was a drug offense case. There was substantial circumstantial corroboration of the grand jury testimony. Because of that, and a general affirmation by the witness at trial of his grand jury testimony, the Eighth Circuit held the grand jury testimony admissible under Rule 804(b)(5). As to the Confrontation Clause, it held that Carlson had waived his right, reasoning that Carlson should not be allowed to complain of the silence of the witness when he was the procurer of the silence. *See Motes v. U. S.,* 178 U.S. 458, 471–472, 20 S.Ct. 993, 44 L.Ed. 1150.

On the other hand, in *United States v. Gonzalez,* 5th Cir., 559 F.2d 1271, the Fifth Circuit, in another drug offense case, held that the testimony of the grand jury witness was inadmissible. There the grand jury witness had been most reluctant to testify during his appearance before the grand jury, apparently torn between the possibility of injury to himself or his family if he testified and further imprisonment for contempt if he refused. Faced with these unpleasant alternatives, the pressure to testify may have prompted the witness falsely to identify the defendant as his employer, and the identity of the employer was entirely dependent upon the testimony of the witness.

 Since we have canvassed this scene in *West,* we need not repeat it here. It is enough to recite that sworn grand jury testimony may be admitted under Rule 804(b)(5) when there are substantial guarantees of trustworthiness equivalent to those which warrant recognized exceptions to the hearsay rule. The admission of such sworn testimony is not a violation of the Confrontation Clause of the Constitution if it bears sufficient guarantees of reliability and the circumstances contain a sufficient basis upon which the jury may assess its trustworthiness. The distinction is illustrated by the strong indicators of reliability found in *West* and the absence of such indicators in *Gonzalez. See also U. S. v. Rogers,* 549 F.2d 490 (8th Cir. 1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977).

Here there are strong indicators of reliability, and the jury had an ample basis upon which to determine the trustworthiness of the testimony.

One of the two young women who, according to Robinson's grand jury testimony, had accompanied Garner and him on their trip to Amsterdam beginning on October 15, 1974, was produced as a witness at the trial. She fully confirmed Robinson's grand jury testimony about the trip. She, Miss McKee, and a Miss Hallums, had accompanied Garner and Robinson to Amsterdam for the purpose of serving as couriers. While in Amsterdam, Miss McKee shared a hotel room with Robinson, while Miss Hallums shared another nearby room with Garner. After Garner and Robinson had procured the heroin, she testified, Robinson "blended" it into power form and packaged it into two packages. This was done in a hotel room in which Garner and the two women were also present. Miss McKee "snorted" some of the heroin, and the men showed the girls how to conceal one package each in her girdle. The two girls then flew to Dulles, while the two men took another plane to New York, just as Robinson had testified. When the men got to Washington, Miss McKee testified she delivered the two packages of heroin to Garner, who was sitting on the passenger side of a car being driven by Robinson.

Moreover, there was irrefutable evidence of their travels. The United States introduced records of airline tickets, customs declarations, passport endorsements, and European hotel registrations. They show that McKethan made five trips to western Europe between mid-July 1974 and mid-March 1975. Garner made seven such trips in the same period. These records show

that McKethan was in Amsterdam in early September 1974 when Robinson testified that he and Garner met him there and made their first contact with the Chinese supplier. McKethan and Garner were also in Copenhagen at the same time in December 1974 and apparently were traveling on the same flights to Copenhagen and Amsterdam in March 1975.

Moreover, the records show that Henry Thompson arrived at Dulles from Europe on September 4, 1974. Thompson was a member of the United States Armed Forces stationed in West Germany. He was McKethan's cousin. On his entry form he noted that he would be staying with McKethan and that McKethan was a person who would know his whereabouts. Robinson had testified that Garner had used Thompson, their initial heroin contact in Europe, as a courier after Garner's first trip, although the available records indicate that Thompson was on the same flight with Garner and Robinson returning from their first joint trip. Testifying from his recollection more than a year later, Robinson may have been confused about which trip Thompson made, but the record of Thompson's flight provides general corroboration of Robinson's testimony that he was used as a courier.

These travel records would contain no implication of guilt if the record contained any reasonable explanation of them consistent with innocence. If the defendants were stewards employed by Pan American Air Lines in international flights, their frequent European travels would contain no suggestion of wrong doing. Suspicion would not attach if they were reputable international businessmen with branches in Holland, Denmark and the United States. For others of us, however, having no patent occasion for frequent European travel, the sudden onset of successive trips of short duration alone can raise suspicion as long as any reasonable explanation is lacking. As to Garner, there is no suggestion of any such explanation. McKethan testified, however, and attempted to offer one but, as a description of it will indicate, it may fairly be regarded as preposterous. The only believable explanation of the frequent trips is that offered by Robinson in his grand jury testimony, and the record of the trips strongly tends to corroborate the testimony.

McKethan was employed as a cargo handler by United Airlines in Washington National Airport. His airline employment, he testified, entitled him to very large discounts on airline fares, and he made his frequent trips to Frankfurt, Copenhagen, Amsterdam, and London mostly for pleasure. For a while he had a girlfriend in Copenhagen, a fact that Robinson had mentioned. He was also learning the "language of the pyramids" from a black African in Europe,[1] and he was busy making inquiries in Germany and Sweden about the importation into the United States of Mercedes-Benz automobiles and Swedish sheepskin jackets. He did not suggest how an airline cargo handler might finance such businesses, nor was any such business developed.

Robinson, in his grand jury testimony, did not suggest that McKethan was a part of the distribution business conducted jointly by Garner and Robinson for a number of months, and later separately by each, but did testify that McKethan was the one who initially suggested that he could put them in touch with Henry Thompson in Frankfurt as a source of supply. According to Robinson, he agreed to meet them in Frankfurt in September, but by the time Garner and Robinson arrived at Thompson's house, they were told by Thompson's girlfriend that she was to take them to Amsterdam. In Amsterdam they did meet McKethan and Thompson, who put them in touch with a Chinese supplier. According to Robinson, McKethan was paid some $10,-000 for his part in arranging this source of supply for them. Later, Robinson had testified, McKethan agreed to meet Garner in Amsterdam, for the purpose of showing

---

1. According to McKethan, knowledge of this "lost language of the pyramids" would enable him to arrive eventually at "logical procedures of understanding." McKethan sought in Copenhagen "rhythm[s] of understanding."

Garner how to avoid the thorough searches made of passengers flying out of Amsterdam to the United States. This turned out to be no more than taking a train from Amsterdam to Copenhagen and flying from there to the United States. Afterwards McKethan complained to Robinson that Garner had not paid him the $7,000 he promised. Moreover, the joint trip by Garner and McKethan in March 1975, against this background, does not suggest that McKethan was off on an independent lark of his own.

McKethan did admit having received a payment of $3500 from Robinson on one occasion, but he claimed that he had set up a grocery business for Robinson, though none of the stock was issued in Robinson's name, and the $3500 was in payment for his services in setting up the grocery business.

■ McKethan's testimony does not tarnish the badges of reliability for Robinson's grand jury testimony. He offered innocent explanations of his frequent trips to Europe, but the jury was entitled to find the explanation incredible. The fact remains that the truthfulness of Robinson's grand jury testimony is strengthened by the testimony of Miss McKee and, particularly, by the airline tickets, customs declarations, passport endorsements, and hotel records. This is enough to satisfy the requirements of Rule 804(b)(5) and to avoid the bar of the hearsay rule. It also satisfies the requirements of the Confrontation Clause.

In this case, of course, Robinson did appear on the witness stand. Indeed, the defendants complain that this prejudiced their cases in the minds of the jurors, but the judge ordered the initial examination of Robinson in the presence of the jury in order that the jury would not be left with speculation about the reason for Robinson's absence, speculation which might have suggested inferences more hurtful to the defendants than Robinson's refusal to testify. He was presented for cross-examination only after Robinson had stated in an *in camera* hearing that he might answer the questions of defense counsel, and that he could not tell whether he would respond until they asked the questions. Though, as we have indicated earlier, the jurors may have taken Robinson's earlier disclaimers of knowledge as equivalent to a later explicit refusal to testify, they also may have received such disclaimers, with Robinson's statement that his grand jury testimony was inaccurate, as exculpatory. In any event, the jury saw and heard Robinson on the witness stand. What they saw and heard may have been of substantial assistance to the jury in assessing the truthfulness of his grand jury testimony. We do not hold, however, that this cross-examination under these difficult circumstances was adequate to meet the requirements of the Confrontation Clause. *Cf. U. S. v. Insana,* 423 F.2d 1165 (2d Cir.), *cert. denied,* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970); *U. S. v. Mingoia,* 424 F.2d 710 (2d Cir. 1970). It is enough that the grand jury testimony was admissible because of its strong corroboration by the testimony of Miss McKee and the undeniable records.

### III.

Garner received two successive ten-year sentences under the federal narcotics conspiracy statute, one for conspiracy to import heroin in violation of 21 U.S.C. § 963 and one for engaging in a conspiracy to distribute heroin in violation of 21 U.S.C. § 846. He objects to the imposition of two successive sentences upon him, claiming that there was one conspiracy though it encompassed both importation and distribution.

■ The Supreme Court in *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), held that under the general conspiracy statute[2] Congress intended to authorize the imposition of only one sentence, though any given conspiracy may contemplate the commission of more than one substantive crime. What is required, however, is that each separate conspiracy statute be examined to determine the congressional intent with respect to the possi-

2. 18 U.S.C. § 371.

ble imposition of successive sentences.[3] With respect to the federal narcotics conspiracy statutes, this was carefully done by the Fifth Circuit in *United States v. Houltin,* 525 F.2d 943 (5th Cir. 1976), modified in 553 F.2d 991.[4] For the reasons stated by the Fifth Circuit in *Houltin,* we think that in enacting the federal narcotics acts the Congress regarded conspiracy to import heroin and conspiracy to distribute heroin in the United States not only as separate offenses but as offenses so compounding each other that a conspiracy embracing each should be treated as two separate conspiracies, warranting the imposition of successive sentences for violations of the two separate conspiracy statutes.

## IV.

The defendants advanced a number of other contentions of less moment, but we find no reversible error in any of them.

*AFFIRMED.*

WIDENER, Circuit Judge, concurring and dissenting:

While I concur in Parts III and IV of the opinion, I respectfully dissent to admitting the grand jury testimony for the reasons I have expressed in *United States v. Payne,* 492 F.2d 449 (4th Cir. 1974), and *United States v. West et al.,* 574 F.2d 1131 (4th Cir. 1978).

---

3. *Simpson v. United States,* —— U.S. —— ——, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978); *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

4. *Accord United States v. Marotta,* 518 F.2d 681, 685 (9th Cir. 1975). *But see U. S. v. Honneus,* 508 F.2d 566 (1st Cir. 1974); *U. S. v. Adcock,* 487 F.2d 637 (6th Cir. 1973).