**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 94-5464

CHARLES WILLIAM MCHAN,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                          No. 94-5657

CHARLES WILLIAM MCHAN,
Defendant-Appellee.

Appeals from the United States District Court
for the Western District of North Carolina, at Bryson City.
Richard L. Voorhees, Chief District Judge.
(CR-90-41-B)

Argued: January 29, 1996

Decided: December 4, 1996

Before HALL, NIEMEYER, and LUTTIG, Circuit Judges.

_____


Affirmed in part, vacated in part, and remanded by published opinion.
Judge Niemeyer wrote the opinion, in which Judge Luttig joined.
Judge Hall wrote an opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Sean Patrick Devereux, WHALEN, HAY, PITTS, HUGENSCHMIDT, MASTER, DEVEREUX & BELSER, P.A., Asheville, North Carolina, for Appellant. B. Frederic Williams, Jr., Assistant United States Attorney, Kenneth Davis Bell, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, Charlotte, North Carolina, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After pleading guilty in 1988 to conspiring to distribute marijuana, Charles William McHan was convicted again in 1992 of participating in another marijuana distribution conspiracy, operating a continuing criminal enterprise, and committing various narcotics and tax offenses. The district court sentenced McHan to 150 months imprisonment and ordered him to forfeit $395,670 in proceeds from his drug operations.

On appeal from his 1992 conviction, McHan contends that the district court committed reversible error (1) in denying his motions to quash his indictment on transactional and use immunity grounds; (2) in denying his motion to dismiss various counts of his indictment on double jeopardy grounds; and (3) in admitting at his trial the grand jury testimony of a cooperating co-conspirator who had died before trial. On its cross-appeal of McHan's sentence, the government contends that the district court erred (1) in departing downward under U.S.S.G. § 5G1.3 on the basis of McHan's 1988 sentence even though McHan had completed serving that sentence by the time of his sentencing in this case, and (2) in deducting from McHan's forfeitable drug proceeds the costs of his drug operations as well as one-half of the proceeds received by a drug joint venture of which McHan was a one-half partner.

Finding no error in McHan's 1992 prosecution, we affirm his conviction. But because we conclude that the district court abused its dis-

2

cretion in departing downward to credit McHan for his discharged sentence and erred in deducting from the amount of McHan's criminal forfeiture both the costs of his drug operations and one-half of his drug partnership's revenues, we vacate McHan's sentence and remand this case for resentencing.

I

On May 3, 1988, Charles McHan was arrested while attempting to purchase 200 pounds of marijuana from an undercover government agent, and he and others were indicted for conspiring to possess with the intent to distribute 200 pounds of marijuana, in violation of 21 U.S.C. § 846. McHan pled guilty, and the court sentenced him to 52 months imprisonment.

Contemporaneously with McHan's guilty plea, Paul Cunningham, an indicted co-conspirator, entered into a plea agreement with the government, promising to testify truthfully in any proceedings later designated by the United States. At that time, the government knew that Cunningham was suffering from advanced emphysema and was not expected to live more than two years. To preserve Cunningham's testimony, the government brought him before a federal grand jury in October 1988, where he testified about, inter alia, McHan's involvement in both the 1988 conspiracy and earlier marijuana dealings. Cunningham died less than five months later.

When McHan later learned that the government was considering using his conspiracy plea as a predicate offense for a continuing criminal enterprise (CCE) charge against him, he attempted to withdraw his 1988 guilty plea. The district court, however, denied McHan's motion. On appeal of his 1988 conviction, we affirmed the district court's refusal to allow McHan to withdraw his guilty plea, but we remanded the case for resentencing because the court had erroneously granted McHan a downward departure "in recognition of his strong community ties and substantial charitable contributions." United States v. McHan, 920 F.2d 244, 245 (4th Cir. 1990) (McHan I). The district court resentenced McHan in March 1991 to 63 months imprisonment.

Following resentencing, the government obtained in rem civil forfeitures of two of McHan's automobiles and McHan's interest in a

3

35-acre property. And we affirmed those forfeitures with an unpublished, per curiam opinion. United States v. 35 Acres, No. 90-7376, 940 F.2d 654 (4th Cir. Aug. 15, 1991) (Table) (McHan II).

Beginning in September 1989, during litigation over his attempt to withdraw his 1988 plea, McHan began negotiating a cooperation agreement with the government. When McHan and his attorney, Mark Kadish, met with Assistant United States Attorney (AUSA) Max Cogburn on January 16, 1990, to discuss McHan's potential cooperation, Cogburn questioned McHan about his and others' drug-related activities. Then, on February 2, 1990, two weeks after his initial meeting with Cogburn, McHan submitted to an interview without his counsel by State Bureau of Investigation (SBI) Agent Tom Frye and Federal Bureau of Investigation (FBI) Agent Joe Gilson. No transcript was made of either the January or February interviews.

In March 1990, McHan was indicted in this case for distributing and conspiring to distribute marijuana. Following indictment, his new attorney, Sean Devereux, not only wrote to AUSA Cogburn maintaining that McHan had reached an oral agreement with the government in January 1990 that precluded McHan's indictment, but also filed two motions to quash the indictment, one asserting transactional immunity and the other, use immunity. Nevertheless, Devereux also notified the government of McHan's continued availability for questioning and a polygraph examination.

While the parties "agreed to disagree" about the existence of a non-prosecution agreement, the United States further availed itself of McHan's cooperation in July 1990. FBI Agent Frye and an Internal Revenue Service (IRS) agent questioned McHan on July 17, 1990, and two IRS agents questioned him on July 25, 1990. Sean Devereux attended both debriefing sessions, and a court reporter transcribed the proceedings.

The grand jury returned a superseding 17-count indictment against McHan in September 1990. Count 1 charged that from November 1984 to November 1986 McHan conspired to possess with the intent to distribute and to distribute more than 50 kilograms of marijuana, in violation of 21 U.S.C. § 846. Counts 2-12 alleged various substantive drug offenses during the summer of 1985, in violation of 21

4

U.S.C. § 841(a)(1) and 18 U.S.C. §§ 2 and 545. Counts 13-15 alleged that McHan had filed false income tax returns from 1985 through 1987, in violation of 26 U.S.C. § 7206(1). Count 16 charged McHan with operating a CCE by "doing, causing, facilitating, and aiding and abetting the importation, possession with intent to distribute, and distribution of marijuana" from November 1984 to May 1988, in violation of 21 U.S.C. § 848. And Count 17 sought a forfeiture under § 853 of any property, including $1,830,870 in currency, that McHan had either "obtained directly or indirectly as a result of" or "used or intended to . . . use[ ] . . . in any manner or part, to commit, or to facilitate the commission of the felony drug violations charged in the Superseding Indictment."

McHan refiled his motions to quash on immunity grounds. After an evidentiary hearing before a magistrate judge, the judge made findings and recommended denial of McHan's motion asserting transactional immunity. The district court adopted the recommendation. Upon McHan's request, the district court deferred ruling on McHan's second motion, which asserted use or derivative use immunity, until the presentation of evidence at trial. Trial commenced in March 1991.

Shortly after trial began, McHan reached a plea agreement with the government, which the district court accepted. McHan's wife, however, refused to forfeit certain property as required by the agreement, and the court rescheduled McHan's trial to begin again in December 1991.

As the trial began for the second time, McHan filed motions to dismiss his superseding indictment as violative of the Fifth Amendment's Double Jeopardy Clause. The district court denied McHan's motion, and on McHan's interlocutory appeal, we affirmed, holding (1) that McHan's 1984-86 conspiracy constituted "a separate and distinct offense from the 1988 conspiracy" and (2) that "McHan's participation in each of the conspiracies, even though alleged to be predicate acts of a [CCE], constitute[d] separate offenses" from the CCE offense charged. See United States v. McHan, 966 F.2d 134, 136 (4th Cir. 1992) (McHan III).

McHan's third trial began on July 20, 1992. On the first day of trial, McHan announced his decision to plead guilty to Counts 2-7 of

the superseding indictment, charging him with possessing, distributing, and aiding and abetting the possession and distribution of marijuana in April, July, and August, 1985. During the trial on the remaining counts (except Count 17 seeking forfeiture), the government read Paul Cunningham's grand jury testimony into the record over McHan's objection. The jury convicted McHan of Counts 1 and 8-16.

In his post-trial motions for judgments of acquittal, McHan renewed his double jeopardy challenges, asserting that his trial had developed a fuller evidentiary record than was available to the trial court when it denied his motions earlier. The district court denied those motions. McHan also filed a post-trial motion in December 1993 for a hearing under Kastigar v. United States, 406 U.S. 441 (1972), on the government's "direct or derivative use" of information that McHan had provided during his February and July, 1990 debriefings. Following a separate hearing on the motion, the district court also denied it.

After McHan waived his right to a jury trial on Count 17, the forfeiture count, the court conducted a bench trial, beginning in August 1992. At that trial, the United States sought forfeiture of the currency McHan had received in the deals that formed the basis for the other counts in his indictment. At the conclusion of trial, the district court ordered McHan to forfeit $395,670. Based on the evidence presented, the court found that from the marijuana sales McHan had conducted either individually or together with Paul Cunningham, McHan had received $1,489,350. The court then deducted from that sum (1) $857,030, representing the total amount that McHan had expended to purchase and transport the marijuana he sold, and (2) $236,650, representing Cunningham's one-half share of receipts from the McHan-Cunningham drug partnership.

At McHan's sentencing on June 10, 1994, the district court calculated McHan's base offense level at 34 and his criminal history category at III, calling for a sentencing range of 188-235 months imprisonment. But because, in December 1993, McHan had completed serving the 63-month sentence on his 1988 conviction, the court granted McHan's motion for a downward departure of 56 months to credit McHan for the time he actually served, explaining

6

that "the guidelines as drafted did not contemplate a situation where the defendant had already served a sentence for some of the relevant conduct." The court then sentenced McHan to 150 months imprisonment, a sentence towards the middle of the adjusted guideline range.

McHan has appealed to this court, challenging his conviction, and the government has cross-appealed McHan's sentence. For the reasons that follow, we affirm McHan's conviction but remand this case for resentencing.

II

McHan contends first that the district court erred in denying his motions to quash his indictment because the government violated the transactional and use, or derivative use, immunity it had given him. Because we conclude that the district court did not clearly err in finding that the parties' agreement provided McHan with use and derivative use, but not transactional, immunity and that the government did not violate the use or derivative use immunity, we affirm the court's denial of McHan's motions.

A

In his transactional immunity argument, McHan contends that by pursuing the instant indictment against him, the government violated (1) the parties' express oral agreement that McHan would not be prosecuted further if he cooperated with government agents; (2) the implied non-prosecution agreement that AUSA Cogburn accepted when he opted to debrief McHan despite his awareness that McHan's counsel insisted on transactional immunity for his client; and (3) McHan's "equitable immunity" that arose from his good faith, reasonable reliance on the government's conduct indicating "that, if he kept his part of the bargain, he would not be punished further." The government responds that it never offered McHan a non-prosecution agreement and that McHan submitted to debriefing merely "in hopes this would lead to an agreement." Alternatively, the government maintains that even if it did accord McHan transactional immunity, McHan forfeited that immunity by lying about his criminal conduct during his debriefings.

Agreements to exchange cooperation for transactional immunity are governed by traditional principles of contract law, United States v. Thompson, 25 F.3d 1558, 1562 (11th Cir. 1994); United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991); see also Santobello v. New York, 404 U.S. 257, 262 (1971) (defendant entitled to enforcement of bargained-for plea agreement), and, therefore, may be express or implied. While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement. See 1 Restatement (Second) of Contracts § 19 (1979). Under the concept of "equitable immunity," moreover, courts may enforce informal grants of transactional immunity where:

> (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

Rowe v. Griffin, 676 F.2d 524, 527-28 (11th Cir. 1982); see also United States v. Carter, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc) (government bound by promise of immunity when defendant incriminated himself in reliance on the promise). Accordingly, to succeed on his transactional immunity argument, however it is stated, McHan must demonstrate at least a meeting of the minds that the government would refrain from further prosecuting him in exchange for his cooperation.

At the November 1990 hearing on McHan's transactional immunity claim, Max Kadish, McHan's former counsel, testified that an agreement was reached regarding disposition of all pending litigation, including a pending forfeiture action and a pending appeal on the 1988 conviction; cooperation by McHan; and immunity from further prosecution. In reaching agreement he testified that he had told AUSA Cogburn that McHan would not submit to debriefing unless the government guaranteed that there "wouldn't be any further criminal prosecution." Kadish also stated that he and McHan had decided on that position together and that he understood Cogburn to acquiesce in their conditions. Kadish admitted, however, that the alleged nonprosecution agreement was never memorialized "in any kind of docu-

8

ment," and that he could not remember essential terms of the alleged agreement, including the length of sentence McHan would receive on the pending 1988 prosecution, or when the government agreed to those terms. Moreover, in response to Mr. Cogburn's inquiry on cross-examination as to whether it "would . . . be accurate to say that the only real agreement that occurred between [Kadish] and [Cogburn] at that time with regard to any specifics was that nothing that Mr. McHan said during the debriefing would be used against him," (emphasis added), Kadish conceded, "[T]hat was very clear. Right."

Although AUSA Cogburn understood that use immunity would be applied to information McHan furnished the government during debriefings, Cogburn testified that the government did not contemplate a "promise not to prosecute." He explained that he told Kadish that they could "probably come to some sort of agreement at some point about Mr. McHan['s] . . . sentenc[e]," but insisted that he "was unwilling to say that [the government] would not prosecute Mr. McHan again on any other charges, although that's what Mr. Kadish wanted."

After the hearing, the magistrate judge recommended denying McHan's motion to quash the superseding indictment based on a transactional immunity agreement. The judge concluded that while the government's evidence of what had transpired was "highly persuasive and credible," McHan's version of events was implausible. It "stretch[ed] the bounds of reasonableness to infer" that the government--despite its general practice in that district of reducing all agreements to writings signed by the parties--"would jeopardize its interest in assets totaling over $1,000,000 and felony prosecutions" with an oral agreement. And it was "also difficult [for the magistrate judge] to accept as true . . . that the most experienced prosecutor in th[e] district would jeopardize his career by compromising matters he had no approval to compromise" and that "a seasoned criminal attorney would rely on a `gentleman's agreement' where his client's liberty and the security of his family [were] at stake."

Reviewing the magistrate judge's recommendation de novo, the district court adopted his proposed findings of fact and conclusions of law. The court believed it an "inescapable conclusion . . . that there was no agreement between defense counsel Mark Kadish and Assis-

9

tant United States Attorney Max Cogburn." Based on the record evidence, we cannot conclude that the district court committed clear error in finding that McHan and the government did not reach agreement that included a promise not to prosecute.

B

While the parties disagree about whether they reached a non-prosecution agreement, they do agree that they had entered into an agreement for McHan's oral cooperation in exchange for use immunity. While the complete terms of that agreement are contested, it is undisputed that McHan agreed to provide truthful information during debriefing sessions and that the United States agreed to refrain from using any such statements against him. McHan argues on appeal that the district court erred in denying his motion to quash the indictment against him because the government materially breached the agreement by making both direct and indirect use of his immunized statements. The government maintains that it did not use any of the statements McHan provided pursuant to the agreement and that McHan, in any event, breached the agreement by providing untruthful information to government agents.

In Kastigar v. United States, the Supreme Court held that the Fifth Amendment Self-Incrimination Clause not only requires the government to provide use and derivative use immunity in exchange for a defendant's compelled testimony, but also imposes upon the government the burden of demonstrating that it did not use such testimony either directly or indirectly against the defendant in a subsequent prosecution. 404 U.S. at 452-53, 460. Whether the oral use-immunity agreement at issue in this case is subject to the full Kastigar protections is doubtful because McHan voluntarily cooperated with the government. See United States v. Roberson, 872 F.2d 597, 611-12 (5th Cir.) (holding Kastigar protections inapposite where cooperation was not compelled but was voluntarily provided pursuant to immunity agreement), cert. denied, 493 U.S. 861 (1989); United States v. Eliason, 3 F.3d 1149, 1152-53 (7th Cir. 1993) (same); United States v. Camp, 72 F.3d 759, 761 (9th Cir. 1995) (same), cert. denied, 116 S. Ct. 1557 (1996). We will assume arguendo, however, that the agreement provided McHan with the full panoply of Kastigar guaran-

10

tees because we conclude that McHan has failed to demonstrate any Kastigar violation.

According to McHan, at the December 3, 1991 hearing on his motion to dismiss his indictment on double jeopardy grounds, AUSA Cogburn cross-examined him with his admission, given during his July 17, 1990 debriefing, that he had gone to Colombia, South America, pointing out that McHan's answers were inconsistent with statements he had made at his debriefings. McHan further submits that Cogburn again improperly cross-examined him about the Colombia trip at his trial. Finally, McHan argues that the United States used the written transcript from his July 17, 1990 interview to refresh "several government memories." Specifically, he refers to the government's use, while cross-examining him at trial, of information that Harold Shook, an associate of McHan's, had stored marijuana on property managed by McHan's real estate company.

The government responds that with respect to the alleged direct use of McHan's admission that he had gone to Colombia, SBI Agent Frye testified at the Kastigar hearing that Tom Posey had told agents that McHan had gone to Colombia. And, with respect to the alleged indirect use of McHan's statement about the marijuana incident involving Harold Shook, Agent Frye testified that he had learned that information in 1987 by questioning Flora Ellison, a former employee of McHan's real estate business.

McHan rests much of his argument on the absence of written records showing that government agents knew about the information for which they claimed independent sources. He contends that the interviews during which Agent Frye claims to have first learned of McHan's Colombia trip were summarized in reports, but that there is no record of the trip in any of those summaries. He further suggests that Agent Frye's failure to mention the Colombia trip and the Flora Ellison interview anywhere in his "37-page affidavit reporting, as of April 28, 1988, every conceivable suspicion about McHan as far back as 1978," calls his testimony into question.

At its core, therefore, McHan's argument is predicated on the credibility of Agent Frye's testimony. But the district court found Agent Frye credible, and we are given no reason to challenge that finding.

11

Because we do not believe that the district court clearly erred in concluding that the government derived the evidence that McHan challenges from independent sources, we affirm its denial of McHan's motion to quash his indictment on use immunity grounds. See State v. Jones, 542 F.2d 186, 199 (4th Cir.) (findings of fact related to independence of evidence from immunized testimony will be upset only if clearly erroneous), cert. denied, 426 U.S. 922 (1976).

In light of our conclusions that McHan never had transactional immunity and that the government did not violate his use immunity, we need not reach the government's alternative argument that McHan breached the agreements by lying to government agents during his debriefings.

III

McHan next argues that the district court violated his rights secured by the Sixth Amendment's Confrontation Clause by admitting into evidence the grand jury testimony of Paul Cunningham, a co-conspirator who had died before trial. The district court admitted Cunningham's testimony under Federal Rule of Evidence 804(b)(5), the residual exception to the hearsay rule. Because we find that Cunningham was unavailable to testify at trial because of his death and that his statements possessed the "requisite indicia of reliability," we conclude that the admission of the Cunningham grand jury testimony did not violate McHan's Sixth Amendment rights.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Despite its absolute language, the Confrontation Clause "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." Maryland v. Craig, 497 U.S. 836, 847-48 (1990). But in Ohio v. Roberts, 448 U.S. 56, 65-66 (1980), the Supreme Court established that before introducing a declarant's prior testimony, the Confrontation Clause requires the prosecution to show (1) that the use of the hearsay is necessary because the declarant is unavailable and (2) that the hearsay bears "indicia of reliability" sufficient to enable the factfinder to evaluate the truth of the hearsay. See also White v. Illinois, 502 U.S. 346, 353-57 (1992) (confining

12

unavailability requirement to statements from prior judicial proceedings and finding indicia of reliability); Idaho v. Wright, 497 U.S. 805, 814-15 (1990) (holding that reliability may be shown by reference to established hearsay exception or particularized guarantees of trustworthiness); United States v. Inadi, 475 U.S. 387, 394-96 (1986) (holding unavailability requirement inapplicable to co-conspirator's statements and finding indicia of reliability). We have applied Roberts' two-prong test to out-of-court statements admitted under Federal Rule of Evidence 804(b)(5) so long as a"particularized" showing of trustworthiness is made. See United States v. Shaw, 69 F.3d 1249, 1253 (4th Cir. 1995); United States v. Workman, 860 F.2d 140, 144 (4th Cir. 1988) cert. denied , 489 U.S. 1078 (1989).

A

While a deceased declarant is indisputably "unavailable" to testify at trial, McHan contends in this case that the government cannot satisfy the unavailability requirement because it "stage-managed" Cunningham's unavailability by failing to depose him pursuant to Federal Rule of Criminal Procedure 15 when it knew he would die before trial. Rule 15 provides that "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the [witness'] testimony . . . be taken and preserved for use at trial," a court may allow "a party" to depose a "prospective witness of a party," Fed. R. Crim. P. 15(d), so long as the opposing party is given notice of the deposition and an opportunity to engage in cross-examination of the same "scope and manner . . . as would be allowed in the trial itself," Fed. R. Crim. P. 15(d). Because "Cunningham was `available' to tell his story" in a way "by which [his] testimony and McHan's right to confront its source could have both been preserved," McHan insists that the Confrontation Clause does not countenance "the government's choice to extract Cunningham's statement in the secrecy of the grand jury chambers."

Underlying McHan's argument on the first prong of the Roberts test is a premise, for which he provides no authority, that where the government knows in advance that a potential witness may become unavailable to testify at trial, the Confrontation Clause requires it to secure the witness' testimony in a manner that reasonably preserves the potential defendant's ability to confront and cross-examine the

13

witness. We have found no authority for that proposition. As long as the government did not create or contribute to the declarant's unavailability at trial, we do not read Roberts and its progeny to hold that the necessity created by the witness' unavailability is somehow lessened simply because the government knew in advance that the witness would be unavailable. When the government knows that a witness will be unavailable, it has the choice of seeking to preserve the witness' testimony under Federal Rule of Criminal Procedure 15, or relying at its own risk on its ability to introduce hearsay (such as the witness' grand jury testimony), or losing the benefit of the witness' testimony altogether. The election it makes, however, does not bear on the Roberts test of whether, at the time of trial, the witness is unavailable. See Roberts, 448 U.S. at 65-66. Absent any suggestion that the government intentionally procured a declarant's unavailability for trial, we reject McHan's attempt to read the Confrontation Clause's "rule of necessity" differently from the hearsay rule's simple "unavailability" requirement and, thereby, to inject a best evidence requirement into the Confrontation Clause jurisprudence.

We add, as further reason to reject McHan's argument, that Federal Rule of Criminal Procedure 15(a) speaks only of depositions by "a party" of "a prospective witness of a party." Because, in this case, McHan had not yet been indicted or charged when Cunningham testified before the grand jury, Rule 15 was not an available avenue for preserving Cunningham's testimony.

B

McHan argues further that the district court erred in finding adequate indicia of reliability to justify the admission of Cunningham's grand jury testimony, a finding we review for clear error. See Workman, 860 F.2d at 144. Grand jury testimony is given in the solemn setting of the grand jury, under oath and the danger of perjury, and in the presence of jurors who are free to question witnesses and assess their credibility and a court reporter who prepares an official transcript of the testimony. The nature of grand jury testimony thus provides some indicia of trustworthiness. See United States v. Murphy, 696 F.2d 282, 286 (4th Cir. 1982), cert. denied, 461 U.S. 945 (1983); United States v. Garner, 574 F.2d 1141, 1144 (4th Cir.), cert. denied sub nom. McKethan v. United States, 439 U.S. 936

14

(1978); United States v. West, 574 F.2d 1131, 1136 (4th Cir. 1978). Nonetheless, it should not be concluded that simply because the hearsay is grand jury testimony it automatically satisfies the second prong of the Roberts test. See United States v. Clarke, 2 F.3d 81, 83-84 (4th Cir. 1993), cert. denied, 510 U.S. 1166 (1994); Garner, 574 F.2d at 1144. Rather, we must "examine the `totality of the circumstances that surround the making of [a proffered hearsay] statement' for `particularized guarantees of trustworthiness.'" Clarke, 2 F.3d at 84 (quoting Wright, 497 U.S. at 822); see also Shaw, 69 F.3d at 1253 ("The issue . . . is whether . . . statements were made under circumstances that guaranteed their trustworthiness such that cross-examination would have been of marginal utility in testing their accuracy").

While there is no "mechanical test for determining `particularized guarantees of trustworthiness' under the [Confrontation] Clause," Wright, 497 U.S. at 822, we believe that Cunningham's grand jury testimony in this case is supported by numerous guarantees which, taken together, justify the district court's decision to admit it. First, Cunningham testified before the grand jury voluntarily. See United States v. Ellis, 951 F.2d 580, 583 (4th Cir. 1991), cert. denied, 505 U.S. 1220 (1992). Second, because Cunningham had participated with McHan in the narcotics offenses, he testified from personal knowledge. See Dutton v. Evans, 400 U.S. 74, 88-89 (1970); Siegfriedt v. Fair, 982 F.2d 14, 20 n.6 (1st Cir. 1992). Third, when Cunningham gave his grand jury testimony, he had already been sentenced pursuant to a plea bargain that granted him immunity. See Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993); Ellis, 951 F.2d at 583. Fourth, Cunningham was gravely ill, and expected to die within two years. See Barker v. Morris, 761 F.2d 1396, 1401 (9th Cir. 1985), cert. denied, 474 U.S. 1063 (1986); see also Mattox v. United States, 156 U.S. 237, 244 (1895) ("[T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce [a] strict . . . adherence to the truth . . ."). Finally, and perhaps most importantly, McHan acknowledged that Cunningham's grand jury testimony, with a few exceptions mostly pertaining to dates, was "fairly accurate" and "close enough." Cf. Fed. R. Evid. 801(d)(2)(B) (excluding from the definition of "hearsay" statements which are offered against a party where the party has manifested an adoption or belief in their truth).

15

IV

To support McHan's contention that his superseding indictment violated the Fifth Amendment Double Jeopardy Clause, he advances three independent arguments. We find none persuasive.

First, reiterating the position that we rejected on interlocutory appeal, McHan argues that his prosecution for the conspiracy and CCE counts in his 1990 superseding indictment were barred by his 1988 conspiracy conviction. In McHan III, we held that McHan's guilty plea to the 1988 drug conspiracy did not bar his prosecution for the 1984-86 conspiracy charged in Count 1 of his superseding indictment. 966 F.2d at 139. While recognizing that McHan had raised a "non-frivolous question about whether there was only one continuous conspiracy," we concluded that the district court was not clearly erroneous in finding from the testimony presented that McHan's "original conspiracy, which was active in 1985 and 1986, had withered by the end of 1987 at the latest." Id. at 138-39. Because we do not agree with McHan that the evidence adduced at his trial demonstrates that his "criminal activities from 1984 through 1988 constitute one continuous, on-going conspiracy," we see no reason to revisit our decision in McHan III.

McHan further contends that the earlier in rem civil forfeitures of his automobiles and his interest in his 35-acre property preclude his prosecution on the 1990 conspiracy and CCE counts. His argument, however, is directly foreclosed by United States v. Ursery, 116 S. Ct. 2135 (1996), in which the Supreme Court recently held that a criminal prosecution following a civil forfeiture does not implicate the Double Jeopardy Clause because civil forfeitures "do not constitute `punishment' for purposes of the Double Jeopardy Clause." Id. at 2138. Because the forfeitures of McHan's automobiles and his interest in the 35-acre property were not "punishment," McHan's contention that his subsequent criminal prosecution represented a second jeopardy is untenable.

Finally McHan argues that a two-level increase in his offense level that he received for his 1988 conspiracy conviction as an organizer, leader, manager or supervisor under § 3B1.1(c) bars his CCE conviction because the CCE statute requires the same element, that he be an

16

organizer, supervisor, or manager of five or more other individuals. See 21 U.S.C. § 848(c)(2)(A). But this argument fails to recognize that sentencing enhancements are not the crime for which McHan was charged. The Supreme Court held in Witte v. United States, 115 S. Ct. 2199, 2206 (1995), that the "use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause" because the Sentencing Guidelines punish for only the defendant's offense of conviction. Sentence-enhancing conduct, accordingly, does not preclude later prosecution for that conduct.

V

We now turn to the government's cross-appeal of McHan's sentence, considering first the government's contention that the district court erred as a matter of law in deciding to depart downward and reduce McHan's sentence by 56 months based on the fact that McHan had just finished serving 56 months for his 1988 conviction, which conviction served as predicate conduct for the conviction in this case. The government argues that the Sentencing Guidelines address that issue at U.S.S.G § 5G1.3 and do not permit the downward departure for that reason. We agree.

Section 3553(b) of Title 18 requires a court to impose a sentence within the applicable sentencing guidelines range"unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." We have repeatedly explained that § 3553(b) envisions a two-prong test for evaluating the propriety of a departure. First, the departure must be based on circumstances that were not adequately considered by the Sentencing Commission. Second, the special mitigating or aggravating circumstances present in the case must be of sufficient importance and magnitude to justify a departure. See McHan I, 920 F.2d at 247-48; United States v. Van Dyke, 895 F.2d 984, 986 (4th Cir.), cert. denied, 498 U.S. 838 (1990); United States v. Summers, 893 F.2d 63, 66 (4th Cir. 1990); Cf. United States v. Rybicki, No. 94-5360, ___ F.3d ___, slip op. at 3 (4th Cir. Sept. 26, 1996).

17

The Sentencing Guidelines expressly permit district courts to give sentencing credit only for terms of imprisonment"result[ing] from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense" if the previous term of imprisonment is "undischarged." U.S.S.G. § 5G1.3. The Application Notes and Background Statement to § 5G1.3 similarly limit its application to undischarged terms of imprisonment. And, despite several amendments to the Sentencing Guidelines, the Sentencing Commission has not altered § 5G1.3 to include credit for discharged sentences. See U.S.S.G. App. C, amendments 289, 385, 465, 494, 535. Applying the interpretive maxim expressio unius est exclusio alterius, we conclude that the Sentencing Commission did not leave unaddressed the question of whether a sentencing judge can give credit for discharged sentences, but rather consciously denied that authority. Accord Prewitt v. United States, 83 F.3d 812, 817-18 (7th Cir. 1996); United States v. Bernard, 48 F.3d 427, 431-32 (9th Cir. 1995); United States v. Ogg, 992 F.2d 265, 266 (10th Cir. 1993).

Our decision in United States v. Rogers, 897 F.2d 134 (4th Cir. 1990), on which the district court relied to support its decision to depart downward, does not compel a different conclusion. In Rogers, we held that the district court erred in concluding that it retained no discretion to depart from the mandatory imposition of consecutive sentences under U.S.S.G. § 5G1.3 in sentencing for an offense that the defendant committed while serving an unexpired sentence for an unrelated offense. Id. at 136. But we never even intimated in Rogers that downward departures may be appropriate to credit defendants for previously discharged sentences. Because the district court's downward departure was based on an error of law, we conclude per se that it abused its discretion. See Koon v. United States, 116 S. Ct. 2035, 2047 (1996) ("whether a factor is a permissible basis for departure under any circumstance is a question of law" and a "district court by definition abuses its discretion when it makes an error of law").

On appeal, McHan also contends for the first time that the 22-month delay between his conviction and sentencing justified the district court's downward departure in this case because his previous sentence only became discharged during the 22-month period. The Sentencing Guidelines, however, direct district courts to determine credit for prior sentences at the time of sentencing and provide no

18

exceptions for cases in which the defendant's sentencing has been delayed. Moreover, it was McHan who is principally responsible for bringing about delays in his trial and sentencing by engaging in proactive negotiation and sometimes dilatory litigation. At least where there is no indication that the government intentionally delayed the defendant's processing for the purpose of rendering § 5G1.3(c) inapplicable, we decline to undermine the Sentencing Guidelines' general preference for repose and specific preference for denying sentencing credit for previously discharged sentences. Cf. Prewitt, 83 F.3d at 817 (rejecting ineffective assistance argument based on counsel's failure to argue that § 5G1.3(c) applied to defendant's sentence where defendant had already been discharged from previous sentence and record contained no evidence that government had intentionally delayed defendant's indictment for the purpose of rendering § 5G1.3(c) inapplicable).

Because we conclude that the Sentencing Commission adequately considered--and rejected--credit for previously discharged sentences, the district court's downward departure was based on an error of law, constituting per se an abuse of discretion. See Koon, 116 S. Ct. at 2047. For the same reason, we need not decide whether the district court abused its discretion in concluding that a departure was reasonably justified in McHan's case or whether § 5G1.3(a) denies McHan the benefit of concurrent sentences because he committed part of the conduct underlying his 1992 conviction after he was sentenced on his 1988 conviction.

VI

Finally, the government contends that the district court, in forfeiting $395,670 under 21 U.S.C. § 853 as proceeds from McHan's continuing criminal enterprise, improperly deducted McHan's cost of the drugs sold and included only one-half of the proceeds of one transaction because a partner received the other half. After holding a bench trial, the court determined that McHan had received $1,252,700 from marijuana transactions including $236,650 as a one-half share from a transaction in which he had participated jointly with Paul Cunningham. The total proceeds received, including the partnership transaction were $1,489,350. To compute the amount forfeitable, the district court deducted $857,030 representing the cost of marijuana sold and

19

$236,650 representing the one-half share that Cunningham received, leaving $395,670, which is the amount it ordered forfeited. The government maintains that both deductions were improper. We agree.

A

The government first argues that 21 U.S.C. § 853 reaches gross proceeds from illegal transactions, and not net profits. The district court concluded, however, that in using the term"proceeds" in § 853, Congress intended to give the district court "factual discretion" on what "proceeds" should include. Reasoning that by forfeiting gross proceeds, the court would be twice forfeiting the same property -- the cost paid as well as gross proceeds which includes the cost paid -- the court forfeited only net profits. In doing so, we believe it erred.

The CCE statute originally limited criminal forfeitures for a person convicted of engaging in a continuing criminal enterprise to "profits obtained . . . in such enterprise," 21 U.S.C.§ 848(a)(2) (1982) (emphasis added). But that provision was replaced in 1984 by 21 U.S.C. § 853 which is applicable to this case because McHan's continuing criminal enterprise continued after Congress' amendments to the CCE forfeiture provisions in the Comprehensive Forfeiture Act, Chapter 3 of the Comprehensive Crime Control Act of 1984, became law. See P.L. 98-473, Tit. II, § 235 (a)(1), 98 Stat. 2031-32 (1984); see also United States v. Johnson, 537 F.2d 1170, 1175 (4th Cir. 1976) (holding that application of statute providing penalties for those engaged in CCE did not constitute ex post facto application of statute even though CCE was in operation before effective date of statute). Section 853(a)(1) now authorizes the forfeiture of"any property constituting, or derived from, any proceeds . .. obtained, directly or indirectly, as the result of" a CCE offense. (Emphasis added). In using the term "proceeds," as distinguished from "profits," we believe Congress intended the distinction plainly made.

Webster's preferred definition of "proceeds" reads "what is produced by or derived from something . . . by way of total revenue: the total amount brought in." Webster's Third New International Dictionary 1807 (1961); see also Black's Law Dictionary 1204 (6th ed. 1990) (defining proceeds as "the sum, amount, or value of property sold or converted into money or into other property"). "Profit,"

20

by contrast, is defined as "the excess of returns over expenditure in a transaction or series of transactions," Webster's Third New International Dictionary 1811, or "the gross proceeds of a business transaction less the costs of the transaction," Black's Law Dictionary 1211. Not only did Congress make the distinction in adopting the 1984 amendments, it did so within § 853(a) where it provides that "[i]n lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds." (Emphasis added). The text of the CCE forfeiture statute, therefore, does not appear to suggest an interpretation of "proceeds" so restrictive as to include only the profits realized from a continuing criminal enterprise, and we are instructed to construe the statute liberally to effectuate its remedial purpose. See 21 U.S.C. § 853(o).

The legislative history corroborates our conclusion. In adopting the 1984 amendments, Congress intended to render forfeitable under § 853(a)(1) "[t]he same type of property [that was already] subject to civil forfeiture under 21 U.S.C. § 881(a)(6)." S. Rep. No. 98-225, 98th Cong., 2d Sess., at 211 (1984) (emphasis added). And§ 881(a)(6) authorizes the forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter." The civil forfeiture provision has never been interpreted to permit a deduction for the costs of illicit drug transactions, as McHan urges here for the criminal provision. See United States v. $4,255,625.39, 762 F.2d 895, 905 (11th Cir. 1985) (suggesting that cumulative forfeitures may be permissible under § 881(a)(6)), cert. denied, 474 U.S. 1056 (1986); see also United States v. Banco Cafetero Panama, 797 F.2d 1154, 1161 n.9 (2d Cir. 1986) (same).

Further evidence of Congress' design in § 853 to require the forfeiture of the gross proceeds from continuing criminal enterprises may be gleaned from RICO's parallel criminal forfeiture provision. Congress enacted the Comprehensive Forfeiture Act to amend both the RICO and CCE forfeiture provisions, see Pub.L. 98-473, Tit. II, Ch. III, 98 Stat. 2040, and now the language of the CCE forfeiture provi-

21

sion, 21 U.S.C. § 853, closely tracks that of the RICO forfeiture provision, 18 U.S.C. § 1963. The legislative history to § 1963(a)(3) reveals that Congress believed "[i]t should not be necessary for the prosecutor to prove what the defendant's overhead expenses were" and, therefore, used the term "proceeds" rather than "profits" in the RICO forfeiture statute "to alleviate the unreasonable burden on the government of proving net profits." S. Rep. No. 225, 98th Cong., 2d Sess., at 199 (1984). Because we generally construe the drug and RICO forfeiture statutes similarly, see In re Billman, 915 F.2d 916, 921 (4th Cir. 1990), cert. denied sub nom. McKinney v. United States, 500 U.S. 952 (1992); United States v. Amend, 791 F.2d 1120, 1127 n.6 (4th Cir.), cert. denied, 479 U.S. 930 (1986), and the legislative history to the CCE forfeiture statute specifically indicates that Congress used the term "proceeds" to define the property forfeitable under § 853 for the same reason that it used that term in § 1963, see S. Rep. No. 98-225, 98th Cong., 2d Sess., at 211 (1984), we believe that the RICO forfeiture statute further reveals Congress' intent to forfeit under § 853 all tainted revenues received by a CCE.

Finally, sound policy considerations support the forfeiture of the gross proceeds rather than the profits of criminal enterprises under § 853. The proper measure of criminal responsibility generally is the harm that the defendant caused, not the net gain that he realized from his conduct. Otherwise we would be rewarding unsuccessful drug dealers, or those who could adequately manipulate "their books." Cf. United States v. Jeffers, 532 F.2d 1101, 1116-17 (7th Cir. 1976) (holding that "substantial income" requirement of CCE statute, 21 U.S.C. § 848(b)(2)(B), can be established by substantial gross receipts or substantial gross income), aff'd. in part and vacated in part on other grounds, 432 U.S. 137 (1977); United States v. Sisca, 503 F.2d 1337, 1346 (2d Cir. 1974) (same), cert. denied, 419 U.S. 1008 (1974). Were we to read proceeds in § 853 to mean only profits, moreover, we would create perverse incentives for criminals to employ complicated accounting measures to shelter the profits of their illegal enterprises. The purpose of forfeiture is to remove property facilitating crime or property produced by crime -- all of which is tainted by the illegal activity.

In any event, regardless of whether the costs of McHan's drug operations were included in "proceeds" under § 853(a)(1), they would

22

be forfeitable under § 853(a)(2). That section directs the forfeiture of any "property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" a CCE offense. Because the amounts McHan spent to buy and transport marijuana were used to "facilitate" his criminal enterprise, § 853(a)(2) subjects those amounts to forfeiture. See Autullo v. United States, Nos. 93-3713 and 95-2439, 1996 WL 149346, *4 (7th Cir. 1996) (unpublished) (relying entirely on § 853(a)(2) in rejecting defendant's argument that "cash forfeiture should have been based on profits rather than proceeds" where forfeiture was "based on the cash value of the cocaine that he distributed"); see also United States v. Harris, 903 F.2d 770, 777-78 (10th Cir. 1990) (affirming forfeiture under § 853(a)(2) of $413,493 where sufficient evidence demonstrated that defendant intended to use currency to facilitate possession of marijuana with the intent to distribute).

B

The government also contends that the district court erred in deducting from gross proceeds Cunningham's one-half share of the proceeds received in a transaction in which both McHan and Cunningham were involved. Section 853(a)(1) provides for the forfeiture of tainted property "obtained, directly or indirectly" from a CCE by any person convicted of a CCE offense. (Emphasis added). Construing that section liberally, see 21 U.S.C.§ 853(o), it is not limited to property that the defendant acquired individually but includes all property that the defendant derived indirectly from those who acted in concert with him in furthering the criminal enterprise. See United States v. Benevento, 663 F. Supp. 1115, 1118 (S.D.N.Y. 1987), aff'd, 836 F.2d 129 (2d Cir. 1988) (per curiam). As a member of the McHan-Cunningham joint venture, McHan received all proceeds of the partnership. Simply because the partners thereafter agreed to divide the take does not negate the existence of the proceeds and the taint caused by the illegal activity.

The imposition of vicarious liability under § 853 also resonates with established criminal law principles. Just as conspirators are substantively liable for the foreseeable criminal conduct of a conspiracy's other members, see Pinkerton v. United States , 328 U.S. 640 (1946), they are responsible at sentencing for co-conspirators' "reasonably

23

foreseeable acts and omissions . . . in furtherance of the jointly undertaken criminal activity," U.S.S.G. § 1B1.3(a)(1)(B) (Relevant Conduct); see also United States v. Lamarr, 75 F.3d 964, 972 (4th Cir. 1996), petition for cert. filed (June 10, 1996) (No. 95-9398); United States v. Irvin, 2 F.3d 72, 77 (4th Cir. 1993), cert. denied sub nom. Gonzales v. United States, 510 U.S. 1125 (1994). Because a criminal forfeiture ordered under § 853(a) is"an element of the [defendant's] sentence," Libretti v. United States, 116 S.Ct. 356, 363 (1995), it follows that conspirators should be liable under § 853 for their drug partnerships' receipts.

Finally, the few courts to consider the precise question of whether § 853(a) imposes vicarious liability on co-conspirators have held that it does. See Benevento, 836 F.2d 129 (2d Cir. 1988) (per curiam); United States v. McCarroll, No. 95 CR 48, 1996 WL 355371 (N.D. Ill. June 19, 1996) (unpublished). And in cases involving the RICO forfeiture statute, courts have unanimously concluded that conspirators are jointly and severally liable for amounts received pursuant to their illicit agreement. See United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995), aff'g United States v. Saccoccia, 823 F. Supp. 994 (D.R.I. 1993); United States v. Masters, 924 F.2d 1362, 1369-70 (7th Cir.), cert. denied, 500 U.S. 919 (1991); Fleischhauer v. Feltner, 879 F.2d 1290, 1301 (6th Cir. 1989), cert. denied, 493 U.S. 1074, and cert. denied, 494 U.S. 1027 (1990); United States v. Caporale, 806 F.2d 1487 (11th Cir. 1986), cert. denied, 483 U.S. 1021 (1987); United States v. Wilson, 742 F. Supp. 905, 909 (E.D. Pa. 1989), aff'd, 909 F.2d 1478 (3d Cir.) (Table), cert. denied, 498 U.S. 1016 (1990).

For the foregoing reasons, we affirm McHan's convictions, but vacate his sentence and remand this case to the district court for resentencing in accordance with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

HALL, Circuit Judge, concurring in part and dissenting in part:

I agree with almost everything Judge Niemeyer has written for the majority. I disagree only with the reversal of the 56-month credit for

24

time served on the prior conspiracy conviction. This downward departure was within the district court's discretion, and I would affirm it.

My main concern arises from the structure of the enterprise McHan stands convicted of directing. I concurred in our holding in McHan III that a continuing criminal enterprise, which is itself a conspiracy, could be composed of discontinuous smaller conspiracies.[1] Though I concede the theoretical possibility of such a conspiracy-upon-conspiracy structure -- a theory proved by example here -- I believe that it is far enough from "the heartland" of the guidelines as to provide enough discretion to grant the departure, especially inasmuch as conviction and punishment for CCE and the inevitable continuing lesser-included conspiracy is impermissible. Rutledge v. United States, 116 S.Ct. 1241 (1996); Jeffers v. United States, 432 U.S. 137 (1977).

The majority relies most heavily on U.S.S.G. §5G1.3. That guideline describes, in considerable detail, what role undischarged sentences should play in setting the total sentence, and it recognizes an uncommon degree of discretion in the district courts to fashion a reasonable sentence in complex situations. See§ 5G1.3(c) & comment. (nn. 3-5). Applying the hoary maxim expressio unius est exclusio alterius, the majority concludes that no such discretion exists as to discharged sentences.

I disagree. There are three ways the Sentencing Commission may address a potential ground for departure: (i) it may forbid the factor's use, (ii) encourage it, or (iii) discourage it. Koon v. United States, 116 S.Ct. 2035, 2045 (1996) (citing United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993)). Only in the first case is the district court's discretion entirely foreclosed. The most we can say about discharged sentences from the text of § 5G1.3, even with the help of expressio unius . . . , is that they are not an encouraged basis for departure. To infer that the basis is forbidden is more than the old saw can bear.

Concluding that the district court had some, if limited, discretion to consider a departure here, I must address whether it abused that

_____

[1] **United States v. McHan**, 966 F.2d 134, 139-142 (4th Cir. 1992).

25

discretion, giving "substantial deference" to its decision. <u>Koon</u>, 116 S.Ct. at 2046-2047. I see no abuse, for two reasons.

First, as I stated above, it is an odd paradox that a continuing agreement could be composed of discrete, discontinuous sub-agreements. As <u>Rutledge</u> resolves once and for all, a CCE is simply a conspiracy with certain aggravating characteristics, and conviction of the same conspiracy without those characteristics is unconstitutional. The "series of violations" required by 21 U.S.C. § 848(c)(2) was clearly intended to refer, in the overwhelming majority of cases, to substantive crimes.**2** Moreover, conversely to <u>Rutledge</u>'s holding as to lesser-included conspiracy, conviction and punishment for predicate substantive crimes and the larger CCE is generally permissible. <u>Garrett v. United States</u>, 471 U.S. 773 (1985).

Within the two extremes -- <u>Rutledge</u> and <u>Garrett</u> -- lies this peculiar case, where we have, for § 848(c)(2)'s purposes at least, what amount to substantive conspiracies. I would hold that this peculiarity places this case well outside the "heartland" of the guidelines, and the district court's decision that credit for time served was appropriate was not an abuse of discretion.

Second, McHan was convicted in July 1992, but not sentenced until June 1994. Had he been sentenced any time within sixteen months of his conviction, his prior sentence would have been undischarged. A delay of that length was not, in my view, envisioned by the Commission when it drew its distinction between discharged and undischarged sentences, and the delay thus provides an independent basis for the departure.

To the extent stated above, I respectfully dissent. Otherwise, I join the judgment and opinion of the court.

_____

**2** In dicta in <u>Rutledge</u>, the Supreme Court referred to the "series of violations" as the "series of substantive violations." 116 S.Ct. at 1246 n.7.